# Exhibit A

Neutral
As of: December 27, 2025 9:27 PM Z

# *Silva v. Schmidt Baking Distrib., LLC*

United States Court of Appeals for the Second Circuit

September 16, 2025, Argued; December 22, 2025, Decided

No. 24-2103-cv

**Reporter**
2025 U.S. App. LEXIS 33347 *; 2025 LX 548726; __ F.4th __; 2025 WL 3703088

NATHANIEL SILVA, PHIL ROTHKUGEL, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, Plaintiffs-Appellants, v. SCHMIDT BAKING DISTRIBUTION, LLC, SCHMIDT BAKING COMPANY, INC, Defendants-Appellees.[*]

**Prior History:** [*1] Two commercial truck drivers worked for a baked goods company as W-2 employees through a staffing agency. As a condition of continued work, the company required them to create corporations and execute distributor agreements in their capacities as presidents of the new corporate entities. The agreements contained mandatory arbitration clauses.

The drivers filed a putative class action in Connecticut state court alleging violations of wage and hours laws. The company then removed the action to the District Court for the District of Connecticut (Shea, C.J.), which granted the company's motion to compel arbitration under the Federal Arbitration Act (FAA). The drivers filed this interlocutory appeal of the district court's order, arguing that they are exempt from arbitration under § 1 of the statute. The record on appeal unequivocally demonstrates that the companies they were required to create are mere instrumentalities incorporated at the baked goods company's behest through which the parties have contracted "for the performance of work by workers." *New Prime Inc. v. Oliveira, 586 U.S. 105, 116, 139 S. Ct. 532, 202 L. Ed. 2d 536 (2019)*. As such, we hold that the distributor agreements are "contracts of employment" within the meaning of § 1.

We therefore VACATE and REMAND the judgment of the district court.

## Core Terms

employment contract, transport, arbitrate, district court, business entity, driver, interlocutory appeal, compel arbitration, bake, baked goods, commerce, delivery, entity

**Counsel:** [*2] HAROLD L. LICHTEN (Matthew Thomson, on the brief), Lichten & Liss-Riordan, P.C., Boston, MA, for Plaintiffs-Appellants.

ROBERT F. FRIEDMAN (William J. Anthony, Joshua B. Waxman, Michael S. McIntosh, on the brief), Littler Mendelson, P.C., New York, NY, for Defendants-Appellees.

**Judges:** Before: CHIN, NARDINI, and KAHN, Circuit Judges.

**Opinion by:** MARIA ARAÚJO KAHN

## Opinion

MARIA ARAÚJO KAHN, *CIRCUIT JUDGE*:

---

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

This case concerns the interpretation of § 1 of the Federal Arbitration Act (FAA), which excepts from the Act "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Specifically, the case is about whether contracts between Schmidt Baking Distribution, LLC ("SBD") and single-employee corporations created by delivery drivers are "contracts of employment" under that section.

Plaintiffs-Appellants Nathaniel Silva and Phil Rothkugel ("Silva and Rothkugel") delivered baked goods on behalf of SBD for some time as W-2 employees of a staffing agency. After some months, SBD informed them that, to continue in this work, they would be required to incorporate and sign "Distribution Agreements" on behalf of their corporate entities, which included mandatory arbitration clauses. Silva and Rothkugel [*3] then filed a putative class action in Connecticut state court. Schmidt removed the action to federal court and moved to compel arbitration under the Distribution Agreements.[1] In granting Schmidt's motion to compel arbitration, the district court (Shea, *C.J.*) held that these contracts were not "contracts of employment" under 9 U.S.C. § 1, and therefore were not exempt from the Federal Arbitration Act. *Silva v. Schmidt Baking Distr., LLC*, 732 F. Supp. 3d 194, 201-03 (D. Conn. 2024). We disagree.

**BACKGROUND**

**I. FACTS**

Silva and Rothkugel are individuals who, throughout the relevant period, resided in Connecticut and worked as commercial truck drivers delivering baked goods. Schmidt Baking Company, Inc. ("SBC") is a Maryland corporation that manufactures and markets baked goods; its wholly owned subsidiary, SBD, is also a Maryland company that coordinates the distribution of SBC's products. Silva and Rothkugel allege that SBD and SBC (collectively "Schmidt") have violated Connecticut wage and overtime laws.

In 2020, both Silva and Rothkugel began delivering products for Schmidt. They worked as delivery drivers through a third-party staffing agency and were classified as W-2 employees of the staffing agency. After several months of this arrangement, Schmidt informed both Silva and Rothkugel that, [*4] to continue their work, they would need to form corporate entities and execute "Distributor Agreements" with SBD.[2] Neither Silva nor Rothkugel had prior experience forming or operating a corporation. Under instruction and with assistance from Schmidt, Silva formed "Silva's Baked Goods" and Rothkugel formed "Trout Slayers Baked Breads Inc." In their capacities as presidents of their newly formed corporations, both Silva and Rothkugel entered into "Distribution Agreements" with Schmidt (the "Agreements") to continue performing the same delivery work.

The formal parties to the Agreements were SBD and Silva's and Rothkugel's respective corporations, which were termed "distributor[s]." App'x at 92, 161. Schmidt did not allow Silva or Rothkugel to sign in their personal capacities. The Agreements disavow an employee-employer relationship and state that the parties "intend to create an independent contractor relationship." App'x at 95, 164. They also include mandatory arbitration provisions that bar class-wide proceedings, requiring individual adjudication of any dispute.

Despite the change to the contractual framework of their relationship with Schmidt, Silva and Rothkugel maintain that their [*5] roles remained unchanged. By sworn declaration, they aver that their daily responsibilities, both before and after they signed the Agreements, involved driving a commercial truck to Schmidt's warehouse to pick

---

[1] The FAA requires that courts enforce arbitration provisions in a wide range of written contracts. *See generally* 9 U.S.C. §§ 1-16.

[2] Throughout the litigation and at oral argument, the parties used the terms "LLC" and "corporation" interchangeably and the motions panel order referred to "LLCs." App'x at 627. Both Silva's and Rothkugel's entities are, in fact, corporations. The distinction is not relevant to our analysis.

up fresh baked goods, delivering the products to retail outlets within their assigned territories, unloading the goods, and stocking them on retail shelves. They further declare that they have virtually no role in negotiating any pricing, sales, or promotions with retailers, which are functions carried out by Schmidt.

## II. PROCEDURAL HISTORY

Silva and Rothkugel first filed suit in the Connecticut Superior Court, alleging that Schmidt violated Connecticut wage and overtime laws. Schmidt removed the action to the United States District Court for the District of Connecticut, invoking diversity jurisdiction. Schmidt then filed a motion to compel arbitration and to stay the district court proceedings, relying on the arbitration clauses in the Agreements. Silva and Rothkugel opposed the motion, arguing principally that 1) the Agreements are employment contracts subject to the § 1 exception of the FAA, 2) they, in their individual capacities, are not bound by the arbitration clauses because [*6] they are not parties to the Agreements, and 3) the arbitration clauses are unenforceable.

The district court granted Schmidt's motion and rejected Silva's and Rothkugel's arguments that the Agreements are "contracts of employment" under § 1. The district court also found unavailing Silva's and Rothkugel's arguments regarding their non-party status and unenforceability. Silva and Rothkugel subsequently filed a motion to certify this interlocutory appeal pursuant to *28 U.S.C. § 1292(b)*, which the district court granted.

Silva and Rothkugel then petitioned this Court for leave to appeal. A threejudge panel of this Court granted that petition and directed the parties "to address whether an individual worker falls within the scope of the [exception] in § 1 of the Federal Arbitration Act even if the contract to perform work is signed on behalf of the worker by an LLC incorporated by the worker and not the worker as an individual." App'x at 627.

## DISCUSSION

### I. STANDARD OF REVIEW

This Court reviews *de novo* district court orders granting motions to compel arbitration. *Local Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp., 67 F.4th 107, 112 (2d Cir. 2023)* (per curiam). "In deciding motions to compel, courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Edmundson v. Klarna, Inc., 85 F.4th 695, 702 (2d Cir. 2023)* (quoting *Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)*). We "consider all relevant, admissible [*7] evidence submitted by the parties and . . . draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016)* (citation omitted).

### II. INTERLOCUTORY APPEAL

As an initial matter, Schmidt argues that the motions panel should not have granted the petition for interlocutory appeal. Although we are free to review and reverse the motions panel's decision, *Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 866-67 (2d Cir. 1996)*, we see no basis for doing so.

We agree with the motions panel that this appeal satisfies the statutory criteria for interlocutory appeals set forth in *28 U.S.C. § 1292(b)*. The district court's order involves a "controlling question of law as to which there is substantial ground for difference of opinion," and this appeal will "materially advance the ultimate termination of the litigation" as it will spare the parties the burden of an arbitration that would be obviated by a later decision to the same effect. *Id.* Indeed, the issues presented in this appeal are "difficult and of first impression." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 921 F.2d 21, 25 (2d Cir. 1990).*

Moreover, as discussed at oral argument, the scope of the transportation worker exception is a hotly contested issue that courts have recently been called upon to address with increasing frequency.[3] Accordingly, we conclude that acceptance of this interlocutory appeal **[*8]** is an appropriate exercise of our discretion. *Id.* at 24 ("[I]n exercising our discretion under the statute, we may properly consider the systemwide costs and benefits of allowing the appeal.").

For these reasons, we decline to dismiss the interlocutory appeal as improvidently granted.

### III. "CONTRACTS OF EMPLOYMENT" UNDER § 1 OF THE FAA

The question before us is whether the Agreements between Schmidt and the entities formed by Silva and Rothkugel at Schmidt's request are "contracts of employment" under § 1 of the FAA.[4]

The FAA was passed by Congress in 1925 to require that courts enforce valid arbitration agreements, overcome "judicial hostility to arbitration and establish 'a liberal federal policy favoring arbitration agreements.'" *New Prime Inc. v. Oliveira, 586 U.S. 105, 120, 139 S. Ct. 532, 202 L. Ed. 2d 536 (2019)* (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)*). At the time of passage, Congress had established alternative employment dispute resolution regimes for some groups of transportation workers and was in the process of enacting others. *See, e.g.*, Shipping Commissioners Act of 1872, 17 Stat. 262; *Transportation Act of 1920, 41 Stat. 456*; *Railway Labor Act of 1926, 44 Stat. 577*. For that reason, Congress enacted an exception for those workers in § 1 of the FAA. *Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 121, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001)*. The statute reads in relevant part: "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged **[*9]** in foreign or interstate commerce." *9 U.S.C. § 1*.

In *New Prime Inc. v. Oliveira*, the Supreme Court recently took up the interpretation of "contracts of employment" in § 1. *586 U.S. at 108*. In that case, the Court considered a truck driver's wage and hours suit against a trucking company that had hired him under a contract that labelled him an independent contractor. *See id.* Specifically, the Court examined whether the language in § 1 limits the exception to contracts forming employer-employee relationships or whether it extends to independent contractor relationships. *Id. at 112-21*. The Court began by emphasizing the fundamental principle of statutory construction that words must be understood according to their ordinary meaning at the time of enactment, here 1925. *Id. at 113*. As such, the Court looked to contemporary legal authorities and dictionaries to conclude "that Congress used the term 'contracts of employment' in a broad sense to capture any contract for the performance of *work* by *workers*," notwithstanding whether a contract of employment "signaled a formal employer-employee" relationship. *Id. at 116* (emphasis in original). On that basis, the Court held that contracts creating independent contractor relationships fall within the scope of the **[*10]** exception. *Id. at 121*.

We must now interpret this same phrase to determine whether the contracts before us are "contracts of employment" even though they were signed by Silva and Rothkugel in their capacities as presidents of their

---

[3] *See, e.g., Oliveira v. New Prime, Inc., 857 F.3d 7 (1st Cir. 2017)*, aff'd, *586 U.S. 105, 139 S. Ct. 532, 202 L. Ed. 2d 536 (2019)*; **Saxon v. Sw. Airlines Co., 993 F.3d 492 (7th Cir. 2021)**, aff'd, *596 U.S. 450, 142 S. Ct. 1783, 213 L. Ed. 2d 27 (2022)*; *Bissonnette v. LePage Bakeries Park St., LLC, 49 F.4th 655 (2d Cir. 2022)*, vacated and remanded, *601 U.S. 246, 144 S. Ct. 905, 218 L. Ed. 2d 204 (2024)*.

[4] Schmidt argues that Silva and Rothkugel have waived many of their arguments. To the contrary, we conclude these arguments were adequately raised in the district court. We should not be surprised to see a more thorough and detailed discussion of the legal claims in an interlocutory appeal on a narrow issue. This is especially true where, as here, the motions panel specifically directed the parties to brief a question that was but one of the many issues raised below. *See* App'x at 627. Even if Silva's and Rothkugel's arguments were new, we could exercise our discretion to address them because they present "a question of law and there is no need for additional fact-finding." *Allianz Ins. Co. v. Lerner, 416 F.3d 109, 114 (2d Cir. 2005)*.

respective corporations, rather than in their individual capacities. We take heed of the Supreme Court's admonition in *New Prime* that we should "'respect the limits up to which Congress was prepared' to go when adopting the Arbitration Act" rather than "pave over bumpy statutory texts in the name of more expeditiously advancing" Congress's policy favoring arbitration. *Id. at 120-21* (quoting *United States v. Sisson, 399 U.S. 267, 298, 90 S. Ct. 2117, 26 L. Ed. 2d 608 (1970)*). We are also mindful that the contract at issue in *New Prime*, like those before us here, was signed by an individual worker on behalf of an entity that he formed at the direction of his employer. *See Oliveira v. New Prime, Inc., 141 F. Supp. 3d 125, 128 (D. Mass. 2015)*, aff'd in part, *857 F.3d 7 (1st Cir. 2017)*, aff'd, *586 U.S. 105, 139 S. Ct. 532, 202 L. Ed. 2d 536 (2019)*.

*New Prime's* holding that "contract of employment" was not, in 1925, "a term of art bearing some specialized meaning," but rather a capacious term referring to "nothing more than an agreement to perform work" leaves little room to exclude a contract from the § 1 exception solely because it is between businesses. *New Prime, 586 U.S. at 114*. Indeed, judicial opinions from the time of the FAA's enactment provide numerous [*11] and diverse examples of courts using the term "contract of employment" to refer to contracts for work between business entities; these include contracts between corporations, partnerships, and labor unions.[5] As such, we cannot conclude that a contract is not a "contract of employment" merely because it is signed by business entities. A careful reading of the statute's text confirms this conclusion. Congress specifically enacted the phrase "contracts of employment *of*" workers, not "contracts of employment *with*" workers.[6] Had Congress intended to omit contracts between business entities from the § 1 exception, it could easily have done so.

Urging the contrary conclusion, Schmidt argues that "it is settled that the '§ 1 exclusion be afforded a narrow construction.'" Appellees' Br. at 40-41 (quoting *Circuit City, 532 U.S. at 118*). Yet that admonition from the Supreme Court came in a very different context.

*Circuit City, Inc. v. Adams* concerned a retail sales counselor who argued that his contract fell under the § 1 exception. *Circuit City, 532 U.S. at 110*. In that case, the Court rejected the Ninth Circuit's extremely broad holding that § 1 excepted *all* contracts of employment, even for workers who, [*12] like Adams, did not engage in transportation, because it encompassed the full extent of Congress's commerce power. *Id. at 114*. The Supreme Court reasoned that the enumeration of specific classes of workers in § 1 had to limit the application of the exception in some way; otherwise the statute's residual clause would be superfluous. *Id. at 114-15* ("Construing the residual phrase to exclude all employment contracts fails to give independent effect to the statute's enumeration of the specific categories of workers which precedes it . . . .").

We find the First Circuit's distinction of *Circuit City* persuasive. *See Oliveira v. New Prime, Inc., 857 F.3d 7 (1st Cir. 2017)*. As that court put it, "[t]his context is critical. The [Supreme] Court announced the need for a narrow construction of the § 1 exemption in the course of 'rejecting the contention that the meaning of the phrase "engaged

---

[5] *See, e.g., Miller v. State, 16 Neb. 179, 20 N.W. 253, 253-54 (Neb. 1884)*; *Clifton v. Clark, Hood & Co., 83 Miss. 446, 36 So. 251, 251-52 (Miss. 1904)*; *El Paso & S.W.R. Co. v. Harris & Liebman, 110 S.W. 145, 146 (Tex. Civ. App. 1908)*; *People ex rel. Lackawanna Transp. Co. v. Knight, 75 A.D. 164, 77 N.Y.S. 398, 400 (App. Div. 1902)*; *The De Gama v. Bridges, 150 F. 323, 324-25 (5th Cir. 1907)*; *OLMSTED v. EDWARDS, 19 Ohio N.P. (n.s.) 177, 179, 1913 WL 950, at *1 (Ohio Super. Dec. 22, 1913)*, aff'd sub nom. *Olmstead v. Albers*, 27 Ohio Cir. Dec. 362, 1916 WL 1324 (Ohio Ct. App. Apr. 24, 1916); *Vulcan Detinning Co. v. St. Clair, 315 Ill. 40, 145 N.E. 657, 657 (Ill. 1924)*; *Trump v. Bluefield Waterworks & Imp. Co., 99 W. Va. 425, 129 S.E. 309, 311 (W. Va. 1925)*.

[6] *Compare* Murray, A New English Dictionary on Historical Principles 66 (1905) ("All the existing uses of *of* are derivative; many . . . so weakened down as to be in themselves the expression of the vaguest and most intangible of relations.") *and* Webster's Collegiate Dictionary 670 (3d ed. 1916) (defining "of" as "[i]ndicating the object after a noun denoting an action or agent; as, the commission *of* a crime") (emphasis in original), *with* Webster's Collegiate Dictionary 1098 (3d ed. 1916) ("In general, *with* denotes a relation of contact or association.") *and* Murray, A New English Dictionary on Historical Principles 210 (1928) (defining "with" when used "after words expressing transaction or dealing between persons" as "[d]enoting *personal* relation, agreement, association, connextion, union, addition." (emphasis added)).

in commerce" in § 1 of the FAA should be given a *broader construction than justified by its evident language*.'" Id. at 22-23 (emphasis in original) (quoting Circuit City, 532 U.S. at 118). Like Oliveira, Schmidt and Rothkugel perform truck-driving work that directly impacts "the free flow of goods," 532 U.S. at 121, and they are clearly transportation workers who fall within the ambit of § 1 of the FAA. Their work bears little resemblance to that of the sales counselor at issue in **[*13]** Circuit City, who was just as evidently *not* a transportation worker. As such, Circuit City's narrow construction of which workers are "engaged in foreign or interstate commerce" does not in any way suggest that contracts covering workers who fall within that category are exempt from § 1 simply because they are signed by business entities. Such a limitation "[would be] inconsistent with both the ordinary meaning of the language used in § 1 and 'Congress's demonstrated concern with transportation workers and their necessary role in the free flow of goods.'" Oliveira, 857 F.3d. at 23 (quoting Circuit City, 532 U.S. at 121). That congressional concern is not conditioned on whether the contractual party is an individual worker or their corporate personality, but instead on whether the contract is one under which a transportation worker provides services.

Schmidt urges us to view these relationships as akin to "franchisorfranchisee" or "supplier-distributor" relationships and hold that these fall outside the scope of § 1. Specifically, Schmidt relies on provisions in the Agreements that frame the contract as revolving around the purchase of distribution rights that amounted to "the sole right to sell and distribute Products to Outlets in the Sales Area." App'x at **[*14]** 94, 163. The language of § 1 provides no statutory basis for such a distinction. That a contract includes terms *in addition to* the performance of work does not, in and of itself, remove it from § 1's ambit. On this point, we agree with the Third Circuit's analysis in *Adler v. Gruma Corp.*, in which the court found that a franchise agreement was, indeed, a "contract of employment" because the agreement itself "and undisputed facts show[ed] Plaintiffs contracted with Defendant to 'perform work' by distributing Defendant's food products." 135 F.4th 55, 69 (3d Cir. 2025).

Following the clear instruction of the Supreme Court in *New Prime*, we look to the substance of an agreement, not its formalities, to determine whether it is a "contract of employment" for purposes of § 1 of the FAA. This preference for substance over form is not uncommon in commercial law. In the liability context, for example, courts pierce the corporate veil when business entities are nothing more than alter egos and adherence to the fiction of their separate existence would "sanction a fraud, promote injustice, or promote inequitable consequences."[7] 1 Fletcher Cyc. Corp. § 41.10. So too here. As the district court recognized in certifying this interlocutory appeal, "the actual work performed by **[*15]** workers under business-to-business contracts may be functionally indistinguishable from the work done in employment relationships, and [its] decision creates a potential loophole that could undermine § 1's purpose." Silva, 2024 WL 3566168, at *4. Indeed, to hold otherwise would allow employers to render the exception a nullity, which would vitiate the role played by § 1 in ensuring judicial (rather than arbitral) resolution of disputes involving a vital sector of the nation's workforce.

This approach will not require extensive discovery or evidentiary hearings by district courts adjudicating motions to compel arbitration. In many cases, whether a contract falls within the exception will be clear from the face of the document itself. Even where it is not, limited supporting evidence, such as declarations, will generally suffice. This is such a case.

Turning to the substance of the Agreements, we conclude that they are "contracts of employment" within the meaning of § 1. Some of the most telling evidence that these are employment contracts are the "personal guarantee" provisions of the Agreements holding Silva and Rothkugel personally and unconditionally liable for the performance of the work. *See* App'x at 121, 96-97, 190, **[*16]** 165-166. This provision is not limited to financial liabilities; it extends to the performance of the work itself and blurs the line between a supposedly businessto-business contract and an agreement for personal services. It would be incongruous to allow Schmidt to look, by the very terms of the contract, to the individual drivers for the fulfillment of transportation work while demanding that this Court look no further than the name of the company on the signature line.

---

[7] We do not suggest, of course, that the corporate forms adopted by the drivers in the present case are shams, or that they are alter egos subject to veil-piercing. We offer this analogy simply to illustrate how, in various areas of the law, courts may be required to consider the substance rather than the formality of the relationship between parties.

Moreover, the genesis of the corporations in this case is informative. Silva and Rothkugel did not approach Schmidt as entrepreneurs seeking to establish business entities. Instead, they were existing W-2 employees, albeit through a staffing agency, whom Schmidt directed to create corporations and to use form contracts as conditions for continuing their work as delivery drivers. Furthermore, the work that Silva and Rothkugel did remained largely unchanged after they signed the Agreements with Schmidt. The record on appeal unequivocally demonstrates that Silva's Baked Goods and Trout Slayers Baked Breads Inc. are mere instrumentalities created at Schmidt's behest to dress individual "contracts of employment" in the **[*17]** garb of commercial transactions.

Of course, we recognize that not all business-to-business contracts involving transportation work fall within the exception. As our sister circuits have found, contracts for transportation work between sizeable business entities with many employees do not fall within the scope of the § 1 exception.

In *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, the Ninth Circuit considered the case of three plaintiff corporations that each hired "tens or hundreds of employees" and managed multiple delivery routes for Amazon. *97 F.4th 1190, 1197 (9th Cir. 2024)*; *Amazon's Answering Brief at 22, Fli-Lo Falcon, 97 F.4th 1190 (9th Cir. 2024)* (No. 22-35818) (noting the number of workers employed by plaintiffs). The Ninth Circuit decided that "'contracts of employment' in the transportation worker exception do not extend to commercial contracts *like the [agreements at issue in that case]*" because "a business entity that employs or contracts with transportation workers" is not "'similar in nature' to a transportation worker. " *Fli-Lo Falcon, 97 F.4th at 1196* (emphasis added).

In a factually similar case, the Fourth Circuit considered claims by a plaintiff who also formed a corporation in order to sign a distribution contract with Amazon that contained an arbitration agreement. *Amos v. Amazon Logistics, Inc., 74 F.4th 591, 593, 596 (4th Cir. 2023)*. The plaintiff subsequently hired a fleet of **[*18]** approximately 450 drivers to carry out that contract. *Id. at 593*. The Fourth Circuit narrowly held that "*[s]izable* corporate entities are not 'similar in nature' to the actual human workers enumerated by the text of the 'transportation worker' exemption . . . ." *Id. at 596-97* (emphasis added) (noting that the plaintiff itself employed 450 drivers); see also *Tillman Transportation, LLC v. MI Business Inc., 95 F.4th 1057 (6th Cir. 2024)*.

The key distinction between *Fli-Lo* and *Amos* and the case before us is that Silva and Rothkugel did not form sizeable logistics companies that employ significant workforces. They are individual transportation workers who were required to incorporate to perform the same transportation services they had been performing as individuals.[8] Silva and Rothkugel were presented with a Hobson's choice of adopting a corporate form or losing their jobs. This distinction is dispositive and aligns our holding with the precedent from our sister circuits.

**CONCLUSION**

The Agreements here are the contracts under which Silva and Rothkugel perform transportation work and are therefore "contracts of employment" within the meaning of § 1 of the FAA. We decline to allow employers to circumvent Congress's exception of transportation workers from the FAA's reach by requiring those workers to take the corporate **[*19]** form.

For the reasons set forth above, we **VACATE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

---

**End of Document**

---

[8] Both the *Fli-Lo* and *Amos* courts recognized that there may be "circumstances under which a business entity could qualify for the transportation worker exemption." *Fli-Lo, 97 F.4th at 1202* (Thomas, J. concurring); *Amos, 97 F.4th 597*.